IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100007268775514 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC., INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE 860-961-8699 STORED AT A PREMISES CONTROLLED BY SPRINT, AND INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE 860-885-4047 STORED AT A PREMISES CONTROLLED BY VERIZON | Case No. _____<br><br>**Filed Under Seal**<br><br>September 20, 2018 |

FILED

2018 SEP 21  P 2: 27

U.S. DISTRICT COURT
NEW HAVEN, CT.

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR SEARCH WARRANTS**

I, Keith Warzecha, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application for a search warrant for information associated with Facebook User ID 100007268775514 (hereafter referred to as the "SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. (Facebook), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in **Attachment A**.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I also make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned 860-961-8699 (Target Telephone-

1), which is subscribed in the name of Asten Relerford, ███████████████, Taftville, Connecticut 06380, that is in the custody or control of Sprint Corporation, a wireless communications Service Providers that is headquartered at 6200 Sprint Pkwy., Overlook Park, Kansas, 66251.

3. I also make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned 860-885-4047 (Target Telephone-2), which is subscribed in the name of Sam Callic, ████████, New London, Connecticut 06320, that is in the custody or control of Verizon, a wireless communications service provider that is headquartered at 1 Verizon Way, Basking Ridge, New Jersey, 07920.[1]

4. With regards to Target Telephone-1 and Target Telephone-2 (collectively referred to as the "SUBJECT TELEPHONES"), the information to be searched is described in the following paragraphs and in **Attachment C**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require Sprint Corporation and Verizon Wireless (collectively referred to as "the Service Providers") to disclose to the government the information further described in Section I of **Attachment D**. Upon receipt of the information described in Section I of **Attachment D**, government-authorized persons will review the information to locate items described in Section II of **Attachment D**.

5. Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this

---

[1] This is the second request for such information associated with these telephones. On or about July 9, 2018, the Honorable U.S. Magistrate Judge Donna F. Martinez granted a request for these search warrants.

affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the SUBJECT PHONES.[2]

6.      I am presently employed as a Special Agent with the Drug Enforcement Administration (DEA), Hartford District Office, and have been so since August 2010.  I have been employed with the DEA as a Special Agent since 1996, and until August 2010, I was assigned to the Little Rock (Arkansas) District Office.

7.      During my tenure with the DEA, I have participated in numerous investigations involving individuals suspected of distributing illegal drugs; coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses and undercover police officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs; conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of illegal drugs; provided testimony in Grand Jury proceedings; and spoken with informants and subjects, as well as other local, state and Federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store manufacture, transport, and distribute their illegal drugs.  I have received instruction relative to conducting drug investigations while attending the DEA Academy in Quantico, Virginia.  In addition, I receive periodic in-service training relative to conducting drug investigations.  In the course of my duties as a DEA Special Agent, I have prepared affidavits in support of

---

[2] This is the second request for such information associated with these telephones. On or about July 9, 2018, the Honorable U.S. Magistrate Judge Donna F. Martinez granted a request for this information.

applications for search warrants and arrest warrants and have executed numerous search and arrest warrants.

8.  The facts in this affidavit come from information obtained from cooperating sources, my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

9.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); 843(b) (use of a communication facility to facilitate a narcotics trafficking felony); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking offense) have been and are being committed by ROYSHAWN ALLGOOD, and others. There is also probable cause to search the information described in **Attachment A** regarding the SUBJECT ACCOUNT for evidence of these crimes, as described in **Attachment B**. There is also probable cause to search the information described in **Attachment C** regarding the SUBJECT TELEPHONES, which is currently in the possession of the Service Providers for evidence of these crimes, as described in **Attachment D**.

10.  The Court has jurisdiction to issue the proposed warrants regarding the SUBJECT TELEPHONES and the SUBJECT ACCOUNT because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### Information Provided by CS#2

11.     Beginning in 2016, members of the City of New London Police Department Vice and Intelligence Section have met with a confidential source (designated in this investigation as CS#2) for the purpose of obtaining information regarding narcotics sales and distribution within New London County, Connecticut.

12.     Information provided by CS#2 has been found to be accurate and reliable in that CS#2's information has been corroborated by controlled purchases of cocaine base from ALLGOOD via a separate confidential source (referred to herein as "CS#3"). CS#2 provided information in exchange for assistance with pending federal criminal charges related to the unlawful possession of drugs and a firearm.

13.     CS#2 informed investigators that he/she knew of a drug trafficking organization (DTO) that was obtaining cocaine and marijuana shipped from New York, Florida, and California. The DTO would then distribute the cocaine and marijuana within Connecticut, particularly New London County. CS#2 explained that Jeffrey PEARSON would obtain the cocaine and marijuana directly from sources of supply in Florida and California. PEARSON would then provide the cocaine and marijuana to ALLGOOD and others for localized distribution. According to CS#2, ALLGOOD charged $4,000 per pound of marijuana.

14.     CS#2 informed investigators that PEARSON also acquired kilograms of cocaine from his marijuana source of supply and that PEARSON had approached CS#2 looking for customers to offload the cocaine. CS#2 informed investigators that he/she has seen ALLGOOD with a .45 caliber pistol and a "baby" 9mm pistol, which investigators understood to mean a subcompact 9mm handgun. CS#2 stated the .45 caliber pistol belonged to ALLGOOD but was

5

uncertain to whom the 9mm pistol belonged.  CS#2 also stated that PEARSON has assault rifles located within his garage at his house in Waterford, Connecticut.  CS#2 stated that in the winter 2015, PEARSON approached CS#2 looking to sell an assault rifle.

### Information Provided by CS#3

15.      In January 2018, a confidential source (designated in this investigation as CS#3) provided information to members of the City of New London Police Department Vice and Intelligence Section regarding narcotic sales and distribution by ALLGOOD.  CS#3 cooperated after a state search and seizure warrant was executed at CS#3's residence, which resulted in pending narcotics charges against CS#3.

16.      Information provided by CS#3 has been corroborated by participation in the supervised purchase of narcotics and independent investigation information that are set forth below, and accordingly, CS#3 is believed to be accurate and reliable.  From a photo array, CS#3 identified ALLGOOD as the subject from whom CS#3 buys cocaine.  CS#3 identified ALLGOOD as his source of supply for narcotics.  The CS#3 also informed law enforcement that ALLGOOD is using two phones, Target Telephone-1 and Target Telephone-2, and that ALLGOOD is using these phones in furtherance of his narcotics distribution activities.

### Information Provided by ALLGOOD

17.      On March 23, 2018, members of the New London Police Department Vice and Intelligence Section along with members of the Connecticut State Police Statewide Narcotics East Division executed a search and seizure warrant at a residence connected to ALLGOOD.[3] Upon making entry into the apartment, officers located ALLGOOD in one of the bedrooms.

---

[3] The address is known to the undersigned affiant.

Officers recovered approximately 20.3 grams of a beige rock-like substance believed to be heroin. Field tests were conducted that revealed positive reactions for the presence of heroin. Officers also recovered $2,851 in cash and distribution paraphernalia such as a digital scale, clear plastic bags with cut or torn corners, clear plastic sandwich bags, as well as three cellular telephones, including Target Telephone-1.

18.     Following his arrest, ALLGOOD provided consent to search Target Telephone-1. The contents of the cellular phone were downloaded and ALLGOOD was released on bail.

19.     A review of Target Telephone-1 evidences text and telephone communications between ALLGOOD and PEARSON. For example, ALLGOOD texted PEARSON on March 6, 2018 at 10:30:12 A.M, stating, "I got you bro I was gonna have my boy see you but he can't cook that bitch up how I need it so it's slow till I'm back." The undersigned affiant knows through training and experience that cocaine is converted to crack cocaine by adding water and baking soda to cocaine, boiling the mixture until the moisture evaporates and that the end result is a hard cookie that is cocaine base, commonly known as crack cocaine. As a result, drug traffickers, who frequently communicate in code language on phones in order to thwart law enforcement detection, will frequently use "cooking" or "cooked" to refer to crack cocaine. Thus, when ALLGOOD stated, "cook that bitch up," I believe, based on my training and experience, that ALLGOOD was referring to turning cocaine into crack cocaine.

20.     On March 14, 2018 at 1:03:09 P.M., PEARSON sent ALLGOOD a text message that stated, "I borrowed doe to pay that I got to pay these guys back so lmk I'm coll til they put pressure on me I don't wanna fuck them or hear them mad at me." Based on the reference to "doe," I believe, based on my training and experience, that this was shorthand for "dough" which is common slang for money. I further believe that in this text PEARSON referred to paying a

7

debt to his narcotics source of supply and was seeking to collect money from ALLGOOD for drugs previously provided.

**Information Provided by CS#4**

21.     In July 2018, law enforcement interviewed a cooperating source  (herein referred to as "CS#4") who had knowledge concerning ALLGOOD.  CS#4 identified ALLGOOD as a member of the Elm Street Niggas (E.S.N.) blood gang based in New London, Connecticut, who was supplying heroin, cocaine and crack cocaine to drug traffickers in New London and Windham County.  CS#4 identified ALLGOOD as the primary source of supply for heroin, cocaine and crack cocaine for E.S.N in the same area.  CS#4 also identified Luis BALDWIN and Julius CLUFF as two of ALLGOOD's partners.

22.     CS#4 is a fellow gang member and his information has been corroborated by cooperating defendants, informants, telephone records, financial records, and law enforcement officers in New London County.  CS#4 purchased narcotics from ALLGOOD and was present when ALLGOOD made narcotic transactions with other individuals.  CS#4 stated that ALLGOOD typically keeps his narcotics with one of "his females."  CS#4 identified four of the females as Catrice WILLIAMS, April RANGHELLI, Samiyra HINDS and "Jamie" (last name unknown).  CS#4 stated that he/she has seen ALLGOOD store and retrieved cocaine from Café Le Bank on Bank Street in New London.  CS#4 also stated that ALLGOOD stores narcotics at the residence of an individual known as "DRE" located on Crystal Ave in New London.

23.     CS#4 stated that ALLGOOD works closely in distributing narcotics with other individuals including JULIUS CLUFF and LUIS BALDWIN.  CS#4 stated that ALLGOOD, CLUFF and BALDWIN purchase their heroin in Waterbury, Connecticut, from a male named Leon GREENE.  CS#4 stated that ALLGOOD, CLUFF and BALDWIN would take turns

traveling to Waterbury, Connecticut, to get the heroin. CS#4 stated that ALLGOOD obtains his cocaine from a source in New York and then distributes the cocaine among several individuals in New London County.

24.     CS#4 further stated that ALLGOOD uses his social media accounts, specifically snapchat and Facebook profile (the SUBJECT ACCOUNT), to facilitate his drug trafficking activities. CS#4 reported that ALLGOOD communicated with other traffickers through the message feature of Facebook, the SUBJECT ACCOUNT.

### Facebook Contacts

25.     A review of the publicly viewable portion of the SUBJECT ACCOUNT that belongs to Royshawn ALLGOOD evidences that ALLGOOD is "friended" with the accounts of Luis BALDWIN, a.k.a. "Kaos;" Julius CLUFF; and Leon GREENE. A review of Target Telephone-1, obtained per ALLGOOD's consent following his arrest on March 23, 2018, evidences "GREENE Leon" listed in ALLGOOD's contacts with Facebook Messenger as the source. The name "BALDWIN Luis" listed in ALLGOOD's contacts in Target Telephone-1 with Facebook Messenger as the source. The name "CLUFF Julius" listed in ALLGOOD's contacts in Target Telephone-1 with Facebook Messenger as the source as well as a telephone number. Based on these contacts, there is probable cause to believe that ALLGOOD uses the SUBJECT ACCOUNT to communicate with his coconspirators regarding narcotics trafficking.

26.     On April 25, 2018, DEA arrested GREENE following a wiretap of GREENE's telephone and GREENE was subsequently charged with conspiracy to distribute heroin and cocaine in connection to that investigation. During the wiretap, DEA intercepted a telephone call between GREENE and CLUFF regarding a narcotic transaction. During the intercepted call GREENE informed CLUFF that everything was "Gucci," which based on officer training and

9

experience as well as knowledge of the investigation, was believed to mean good. GREENE, however, further stated "its two (2) dollars more though, than what you seeing already," which was believed to mean that GREENE was increasing the price. CLUFF asked GREENE, "Oh, from, um... The same?" GREENE responded, "Um... Nah, nah, nah, nah, nah! That, you know, the white chick and shit from... you know, how you did with Roy." When GREENE stated, "white chick," it is believed that GREENE was using coded language to refer to cocaine. When GREENE stated, "...how you did with Roy," it is believed GREENE was referring to a prior transaction that CLUFF and ALLGOOD did together with GREENE.[4]

27.     On August 24, 2018, the Connecticut Department of Corrections Intelligence Unit intercepted a prison telephone call between Irving "Jerome" HUDSON and Deandra COOPER. HUDSON is a known E.S.N. member and is currently incarcerated at Northern Correctional Institution for murder. During the call, COOPER informed HUDSON "You got to drop Boy from your call list." When COOPER stated, "Boy," it is believed that COOPER was referring to Royshawn "BOY ROY" ALLGOOD. COOPER went on to explain, "He [ALLGOOD] thinks his phone is on some other shit and found a GPS on his car." COOPER further stated "A FED Tracker. I saw the picture and shit." It is believed that COOPER was referring to a GPS tracker that was placed on ALLGOOD's Hyundai Genesis on August 22, 2018.[5] COOPER informed HUDSON that ALLGOOD sent pictures of the tracker through the SUBJECT ACCOUNT to Samiyra HINDS.

---

[4] The DEA did not intercept any telephone calls between GREENE and ALLGOOD.

[5] On or about August 14, 2018, the Honorable U.S. Magistrate Judge Robert A. Richardson authorized the installation and monitoring of a GPS tracker on Allgood's Genesis.

28.     Affiant knows from his experience and training that individuals engaged in drug trafficking activities such as Royshawn ALLGOOD, Luis BALDWIN, Julius CLUFF and Leon GREENE often send and receive email and text messages regarding narcotics sales, and post photographs and videos of themselves possessing narcotics, firearms, U.S. currency, and associating with co-conspirators on social networking sites.  Some of this information may be viewable by the general public, but accessibility to individual accounts is controlled by the account holder.

29.     In addition to using the SUBJECT ACCOUNT to traffic narcotics and communicate with coconspirators as described above, the undersigned affiant also believes that ALLGOOD is involved in the unlawful possession of firearms and that there is probable cause to believe he has communicated via the SUBJECT ACCOUNT regarding these activities.

30.     In 2015, Quadell DANIELS a.k.a. "Q" and Jerome HUDSON were living together on Steward Street, New London, Connecticut.  Shortly thereafter, DANIELS began dating Genia PICOU who was entering the military.  In July 2017, PICOU purchased seven (7) guns in Georgia and drove the weapons back to HUDSON's New London residence.  On July 20, 2017, New London detectives and federal law enforcement officers initiated a narcotics investigation into John SMITH and executed a narcotics related search warrant for SMITH's residence, seized 173 grams of heroin, a kilogram press and recovered two (2) of the seven (7) guns purchased by PICOU.  According to PICOU, other ESN members are holding the remaining firearms.

31.     CS#4 stated that "Q" (DANIELS), who lived with Jerome HUDSON on Stewart Street, was the gun connect.  CS#4 stated that "Q" obtained a crate of guns from New York and distributed the firearms throughout New London County a couple of years ago.  CS#4

11

stated the firearms were small calibers "like 22's." CS#4 stated that "Q" was trying to keep up his appearance as a gun connect and obtained approximately seven (7) firearms from his girl who was in the military down south.

32.     CS#4 stated that of those seven (7) firearms, "Q" sold one (1) firearm to Michael EDWARDS who also sells marijuana. CS#4 also reported that ALLGOOD purchased a 9mm and BALDWIN purchased one (1) firearm from "Q." CS#4 stated that BALDWIN keeps his firearm with a girl named "Maria" who is the daughter of Johnathan LOPEZ. CS#4 stated that ALLGOOD has another firearm that has a pearl grip and is inscribed "BR" for "Boy Roy." CS#4 stated that Michael HYSLOP keeps his gun in a house next to Jared PACKY on Ocean Avenue.

33.     Toll records and the consensual search of Target Telephone-1 do not evidence any contact information between DANIELS and ALLGOOD on Target Telephone-1 or Target Telepehone-2. Contact information in Target Telephone-1, however, evidences a contact for Jerome HUDSON via Facebook Messenger. HUDSON and DANIELS lived together from 2015 until their respective arrests on November 30, 2017 (DANIELS) and December 26, 2017 (HUDSON). HUDSON is also a known E.S.N. member. Accordingly, there is probable cause to believe that ALLGOOD uses the SUBJECT ACCOUNT to communicate with his coconspirators regarding firearms.

34.     On September 10, 2018, a preservation letter was sent to Facebook for the Subject Account.

**May 8, 2018 Controlled Purchase**

35.     On May 8, 2018, investigators met with CS#3 at a secure location. Investigators searched CS#3's person and his/her belongings for contraband or monies with negative results.

12

CS#3 was provided with state pre-recorded funds with which to purchase crack cocaine from ALLGOOD. In the presence of investigators, CS#3 contacted ALLGOOD on Target Telephone-1. CS#3 conveyed to ALLGOOD that "he had the money" and inquired where they should meet. ALLGOOD instructed CS#3 to go to Ocean Avenue, New London, Connecticut, to complete the transaction.

36.     Constant surveillance was maintained while CS#3 traveled to the Ocean Avenue address. CS#3 did not make any stops or meet anyone prior to arriving at the Ocean Avenue address. CS#3 called ALLGOOD once on Ocean Avenue and asked for a more specific location, which ALLGOOD provided as 24 Ocean Avenue, a hair salon. The CS arrived and met ALLGOOD near ALLGOOD's vehicle, which was parked across from the hair salon. ALLGOOD was at the salon getting his hair braided and accordingly, it appeared that ALLGOOD was in possession of Target Telephone-1, during the transaction.

37.     Once CS#3 arrived at the Ocean Avenue address provided by ALLGOOD, he/she entered the front passenger seat of ALLGOOD's beige Hyundai Genesis. At this time, investigators observed that ALLGOOD was the only other occupant in the Hyundai. Surveillance was maintained on the Hyundai and case agents observed CS#3 exiting the Hyundai after a brief period of time.

38.     CS#3 then travelled back to the secure, prearranged location and met with investigators. CS#3 provided officers with approximately 3.0 grams of suspected crack cocaine purchased from ALLGOOD, which field-tested positive for the presence of cocaine. According to CS#3, ALLGOOD met the CS#3 in the beige Hyundai Genesis and they conducted the narcotics transaction in the Hyundai. CS#3 stated that he/she entered the Hyundai's front passenger seat while ALLGOOD was in the driver's seat. CS#3 stated that, while in the vehicle,

13

ALLGOOD pulled out a "tennis size ball" of crack cocaine and gave the CS#3 a package from within the "tennis size ball" of crack cocaine in exchange for the pre-recorded funds.

### June 11, 2018 Controlled Purchase

39.     On June 11, 2018, investigators met with CS#3 at a secure location. Investigators searched CS#3's person and his/her belongings for contraband or monies with negative results. CS#3 was provided with state pre-recorded funds with which to purchase cocaine from ALLGOOD. CS#3 was also provided with a video recording device.

40.     In the presence of investigators, CS#3 contacted ALLGOOD on Target Telephone-2. CS#3 conveyed to ALLGOOD that he was "ready" (meaning that CS#3 had money to purchase narcotics) and inquired about a meet location. ALLGOOD instructed CS#3 to go to a location on Summer Street in New London, Connecticut, to complete the transaction.

41.     Constant surveillance was maintained while CS#3 traveled to the Summer Street address. CS#3 did not make any stops or meet anyone prior to arriving at the Summer Street address. As CS#3 travelled to the Summer Street address, ALLGOOD was observed exiting the Summer Street address and entering the beige Hyundai Genesis. Once CS#3 arrived at the Summer Street address, he/she met ALLGOOD in the beige Genesis. ALLGOOD was in the driver seat and CS#3 entered the front passenger seat. A short time later, CS#3 was observed exiting the Hyundai Genesis and traveling back to the secure location.

42.     CS#3 provided officers with approximately 4.2 grams of suspected cocaine purchased from ALLGOOD, which field-tested positive for the presence of cocaine. According to CS#3, ALLGOOD met him/her in the beige Hyundai Genesis and ALLGOOD instructed the CS#3 to enter the front passenger seat. CS#3 stated that ALLGOOD was in the driver seat and when CS#3 entered the front passenger seat, the suspected cocaine was waiting for him/her on

the seat. CS#3 stated he/she retrieved the cocaine and gave ALLGOOD the pre-recorded funds in exchange for the cocaine. Case agents also retrieved the video recording device from CS#3.

### June 20, 2018 Controlled Purchase

43.     On June 20, 2018, investigators met with CS#3 at a secure location. Investigators searched CS#3's person and his/her belongings for contraband or monies with negative results. CS#3 was provided with DEA pre-recorded funds within which to purchase Crack Cocaine from ALLGOOD. CS#3 was also provided with a recording device. In the presence of investigators, CS#3 contacted ALLGOOD on Target Telephone-2. CS#3 conveyed to ALLGOOD that he/she wanted to purchase $800 worth of crack cocaine. In a subsequent call, ALLGOOD instructed CS#3 to go to Shaw Street in New London, Connecticut, to complete the transaction.

44.     Constant surveillance was maintained while CS#3 traveled to the Shaw Street address. CS#3 did not make any stops or meet anyone prior to arriving at the Shaw Street address. Once on Shaw Street, CS#3 was in continuous telephone contact with ALLGOOD, who was utilizing Target Telephone-2. While in telephone contact, ALLGOOD provided directions to CS#3 about where to go to complete the transaction. ALLGOOD directed CS#3 to Denison Street, which intersects with Shaw. CS#3 continued on Shaw Street to Denison Avenue in New London. Once CS#3 arrived at the Denison Avenue address, he/she was observed entering the rear passenger seat of a vehicle, identified as a 2009 Honda Civic bearing Connecticut Registration AJ15500. Investigators immediately recognized the front seat passenger as ALLGOOD. The vehicle drove a short distance to Linden Street in New London where CS#3 was observed exiting the vehicle and travelling back to the secure, prearranged location. CS#3's continuous contact with ALLGOOD while en-route to the meet location and up until CS#3 and

ALLGOOD met on Denison Street shows that ALLGOOD had Target Telephone-2 in his possession on the way to the deal location and when the transaction occurred.

45.     Once at the prearranged location, CS#3 provided officers with approximately 10.1 grams of suspected crack cocaine purchased from ALLGOOD, which field-tested positive for the presence of cocaine.  CS#3 also provided the recording device to case agents.

46.     According to CS#3, ALLGOOD was the front passenger in the Honda Civic and that he/she entered the rear passenger seat.  CS#3 stated, once inside the vehicle, the operator began driving which is when he/she gave ALLGOOD the pre-recorded funds and in exchange ALLGOOD gave the CS#3 a portion of the crack cocaine.  On June 21, 2018, CS#3 texted ALLGOOD in order to obtain the remaining amount of drugs paid for on June 20, 2018, but which CS#3 had not received from ALLGOOD.  On June 21, 2018, CS#3 texted ALLGOOD on Target Telephone-2, "what good bro how long til you get here." ALLGOOD responded from the same number "bout to cook more ran out," which CS#3 understood to mean that ALLGOOD was about to make another batch of crack cocaine.  This also suggests that ALLGOOD had Target Telephone-2 at the stash location at which he planned to make this batch of crack cocaine.  CS#3 responded "Oh okay how long til you see me."  ALLGOOD replied the next day, "Hit you soon as I'm done bro give me a LOL tho."  On June 24, 2018,  CS#3 sent the following text to ALLGOOD at Target Telephone-2: "whats good my dude."  ALLGOOD responded, "my bad bro, my boy was in the hospital SMH I couldn't get to anything for a few days I'm get wit u in a little my bad I though he got bagged." CS#3 replied, "OK please bro because I'm out of work," meaning CS#3 did not have any narcotics supply to sell.  On June 27, 2018, ALLGOOD, using Target Telephone-2, texted, "I hope I get good today bro, I dead ass had it for had a play for more than way I had offed it thinking I was going to be good ASAP that didn't happen, my bad I

got you ASAP my word," which CS#3 understood to mean that ALLGOOD would have the

remaining amount of crack cocaine for CS#3 that day.

### August 28, 2018 Controlled Purchase

47.    On August 28, 2018, investigators met with CS#3 at a secure location.

Investigators searched CS#3's person and his/her belongings for contraband or monies with

negative results.  CS#3 was provided with state pre-recorded funds with which to purchase crack

cocaine from ALLGOOD.  CS#3 also showed investigators text messages in CS#3's cellular

phone with Target Telephone-1 and Target Telephone-2 regarding the intended controlled

purchase on August 28, 2018.  In the presence of investigators, CS#3 contacted ALLGOOD on

Target Telephone-2.  CS#3 conveyed to ALLGOOD that "needed two," and that she/he had "two

hundred."  ALLGOOD responded that he had "one-seventy."  ALLGOOD and CS#3 agreed to

meet to complete the transaction.  CS#3 was also provided with a recording device.

48.    Constant surveillance was maintained while CS#3 traveled to the meet location.

CS#3 did not make any stops or meet anyone prior to arriving at the meet location.  Investigators

observed ALLGOOD arrive at the meet location operating his Hyundai Genesis.  CS#3 entered

ALLGOOD's vehicle and exited approximately one minute later.

49.    CS#3 then travelled back to the secure, prearranged location and met with

investigators.  CS#3 provided officers with approximately 4.3 grams of suspected crack cocaine

purchased from ALLGOOD, which field-tested positive for the presence of cocaine.  CS#3 also

provided the recording device to case agents.

50.    According to CS#3, ALLGOOD met the CS#3 in the Hyundai Genesis and they

conducted the narcotics transaction in the Hyundai.  CS#3 stated that he/she entered the

Hyundai's front passenger seat while ALLGOOD was in the driver's seat.  CS#3 further

confirmed that ALLGOOD was the vehicle's only occupant besides CS#3. CS#3 stated that, while in the vehicle, ALLGOOD gave the CS#3 the crack cocaine in exchange for the pre-recorded funds.

### Additional Information Concerning Facebook

51.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

52.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

53.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

54.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

55.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

56.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

57.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

58.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

59.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

60.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

61.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

62.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

63.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

64.     Facebook also retains Internet Protocol (IP) logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

65.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

66.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

21

conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

67.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### Cell-Site Data

68.    Based on my training and experience, I know that the Service Providers can collect cell-site data on a prospective basis about the SUBJECT PHONES. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

69.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the

23

"sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

70.     Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of the SUBJECT PHONES, including by initiating a signal to determine the location of each phone on the respective provider network or with such other reference points as may be reasonably available.

## Pen-Trap Data

71.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## AUTHORIZATION REQUEST REGARDING THE SUBJECT PHONES

72.     Based on the foregoing, I request that the Court issue the proposed warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

73.     I further request that the Court direct each of the Service Providers to disclose to the government any information described in Section I of **Attachment D** that is within its possession, custody, or control.

74.     I also request that the Court direct the Service Providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in **Attachment D** unobtrusively and with a minimum of interference with the Service Providers' services, including by initiating a signal to determine the location of the SUBJECT PHONES on the Service Providers' networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The DEA shall reasonably compensate the Service Providers for reasonable expenses incurred in furnishing such facilities or assistance.

75.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the SUBJECT PHONES would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in **Attachment D**, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as

defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable

necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

76.     Because the warrant will be served on the Service Providers, who will then

compile the requested records at a time convenient to it, reasonable cause exists to permit the

execution of the requested warrant at any time in the day or night.  I further request that the

Court authorize execution of the warrants at any time of day or night, owing to the potential need

to locate the SUBJECT PHONE outside of daytime hours.

**INFORMATION TO BE SEARCHED & THINGS TO BE SEIZED FROM FACEBOOK**

77.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of **Attachment B**.

Upon receipt of the information described in Section I of **Attachment B**, government-authorized

persons will review that information to locate the items described in Section II of **Attachment B**.

## REQUEST FOR SEALING AND CONCLUSION

78.    I further request that the Court order that all papers in support of these applications, including the affidavit, attachments, and search warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation. Based on the forgoing, I request that the Court issue the proposed search warrants.

Respectfully Submitted,

Keith Warzecha, DEA SA

Subscribed and sworn to before me on ___September 20___, 2018

/s/ Robert M. Spector

ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID

100007268775514 that is stored at premises owned, maintained, controlled, or operated by

Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by Facebook**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of Facebook Inc. (Facebook), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in **Attachment A**:

(a)  All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities **July 1, 2017 until September 20, 2018**;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **July 1, 2017 until September 20, 2018**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)      All other records and contents of communications and messages made or received by the user **July 1, 2017 until September 20, 2018**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)      All "check ins" and other location information;

(h)      All IP logs, including all records of the IP addresses that logged into the account;

(i)      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)      All information about the Facebook pages that the account is or was a "fan" of;

(k)      All past and present lists of friends created by the account;

(l)      All records of Facebook searches performed by the account from **July 1, 2017 until September 20, 2018**;

(m)      All information about the user's access and use of Facebook Marketplace;

(n)      The types of service utilized by the user;

2

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within fourteen days of service of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); 843(b) (use of a communication facility to facilitate a narcotics trafficking felony); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking offense) by ROYSHAWN ALLGOOD, and others since July 1, 2017, including, for each user ID identified on **Attachment A**, information pertaining to the following matters:

(a) Narcotics trafficking and firearm possession;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4

**ATTACHMENT C**

**Property to Be Searched**

1.  Records and information associated with the cellular device 860-961-8699 (Target Telephone-1), which is subscribed in the name of Asten Relerford, ███████, Taftville, Connecticut 06380, that is in the custody or control of Sprint Corporation, a wireless communications Service Providers that is headquartered at 6200 Sprint Pwky., Overlook Park, Kansas, 66251.

2.  Records and information associated with the cellular device assigned 860-885-4047 (Target Telephone-2), which is subscribed in the name of Sam Callic, ███████, New London, Connecticut 06320, that is in the custody or control of Verizon, a wireless communications service provider that is headquartered at 1 Verizon Way, Basking Ridge, New Jersey, 07920.

3.  Target Telephone-1;

4.  Target Telephone-2.

## ATTACHMENT D

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider:**

To the extent that the information described in **Attachment C** is within the possession, custody, or control of the Providers, including any information that has been deleted but is still available to the Providers or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Providers is required to disclose to the government the following information pertaining to the Account listed in **Attachment C**:

1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT PHONES for a period of 30 days from the date of the warrant, including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

2. Information associated with each communication to and from the SUBJECT PHONES for a period of 30 days from the date of the warrant, including:

   a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   b. Source and destination telephone numbers;

   c. Date, time, and duration of communication; and

2

d. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the SUBJECT PHONES will connect at the beginning and end of each communication.

3. Information about the location of the SUBJECT PHONES for a period of 30 days, during all times of day and night. "Information about the location of the SUBJECT PHONES" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

   a. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of respective phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   b. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

4. This warrant does not authorize the seizure of any tangible property or the contents of any communications.

3

**II. Information to be Seized by the Government:**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); 843(b) (use of a communication facility to facilitate a narcotics trafficking felony); and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking offense) by ROYSHAWN ALLGOOD, and others during the a thirty day period from the date of the warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ . I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

5

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____            _____
Date                               Signature

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Sprint and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Sprint.  The attached records consist of _____.
I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Sprint, and they were made by Sprint as a regular practice; and

b.      such records were generated by Sprint's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Sprint in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Sprint, and at all times pertinent to the records certified here the process and system functioned properly and normally.

7

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                                           Signature

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon. The attached records consist of

_____. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon, and they were made by Verizon as a regular practice; and

b. such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

9

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                                                  Signature